IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ELIZABETH NEEL, | * |
| Plaintiff | * |
| v. | * CIVIL NO. JKB-10-405 |
| MID-ATLANTIC OF FAIRFIELD, LLC, | * |
| Defendant | * |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Plaintiff Elizabeth Neel formerly worked for Defendant Mid-Atlantic of Fairfield as a licensed nursing home administrator at the Fairfield Nursing and Rehabilitation Center ("Fairfield NRC") in Crownsville, Maryland. Neel took medical leave for a little over two months, but was not reinstated to her former position at the end of her leave. She filed this lawsuit claiming violations of the federal Family and Medical Leave Act ("FMLA") and Maryland public policy. Pending before the Court are the Plaintiff's and the Defendant's motions for summary judgment. (ECF Nos. 19 & 20.) The issues have been briefed by the parties, and no hearing is necessary. Local Rule 105.6. Plaintiff's motion will be granted in part and Defendant's motion will be denied in part.

*I. Background*

Neel began working for Mid-Atlantic in May 2008; her job was to manage the Fairfield NRC. (Am. Compl. ¶ 6, ECF No. 4.) She alleged that, during her employment, her performance met or exceeded Mid-Atlantic's legitimate job expectations and that she consistently received satisfactory feedback from her supervisor, Jeff Grillo, regarding her performance. (*Id.* ¶ 7.) In March 2009, Neel sustained a nonwork injury to her neck, and in subsequent months, she took

several days or partial days off from work to obtain treatment for her neck. (*Id.* ¶ 8.) These periods of time off from work were taken either as sick leave, personal time, or vacation time. (*Id.*) On August 28, 2009, Grillo conducted her performance evaluation; he expressed concern about the frequency with which she took time off from work, but also gave her a performance bonus.[1] (*Id.* ¶ 9.)

Neel was involved in a motor vehicle accident on September 8, 2009; she alleged she suffered more severe injuries to her neck in the accident. (*Id.* ¶ 10.) She stated in her complaint that she underwent several tests and procedures between September 8, 2009, and October 5, 2009, that she continued to use available paid forms of leave for her treatments and tests, and that her absences were all approved by Mid-Atlantic. (*Id.* ¶ 10.) The complaint also alleged that in early October 2009, Neel's physician recommended she undergo a medical procedure that would necessitate an extended leave from work. (*Id.* ¶ 11.) She applied for and was approved by Mid-Atlantic for leave under the FMLA. (*Id.*) Mid-Atlantic admits "it complied with its legal obligation to inform the plaintiff that she was eligible for FMLA leave, to inform the plaintiff that she could take unpaid leave, to inform the plaintiff of her 'key employee' status that might deny her restoration to her full-time administrator position, to inform the plaintiff that restoring the plaintiff to her employment at the conclusion of her anticipated FMLA leave will cause substantial and grievous economic harm, and to inform the plaintiff of the requirements to furnish periodic reports every four weeks." (Answer ¶ 11, ECF No. 6.) She began her leave on October 8, 2009, and periodically updated Mid-Atlantic on her treatment and recovery status. (Am. Compl. ¶ 12.)

---

[1] Mid-Atlantic admitted in its answer that Grillo recommended Neel for a three percent merit increase following the evaluation. (Answer ¶ 9, ECF No. 6.)

Keith Minton, Regional Director of Operations Support, was assigned to fill in as acting administrator at Fairfield NRC. (*Id.* ¶ 13.) Neel notified Mid-Atlantic on November 25, 2009, that her physician had indicated she could return to work in mid-December 2009. (*Id.* ¶ 15.) Mid-Atlantic stated in its answer that Neel's November 25th communication indicated she expected to be released by her physician to return to part-time work in mid-December. (Answer ¶ 15.) Traci Alley, in Mid-Atlantic's human resources department, sent a certified letter on December 1, 2009, to the effect that Mid-Atlantic had identified a successor to Neel and that the successor would begin work in mid-December. (Am. Compl. ¶ 16.) On December 9, 2009, Neel notified Mid-Atlantic that she would be able to return to work without restrictions on December 16, 2009. (*Id.* ¶ 17.) Alley, in response, notified Neel that her position had been filled, that no alternative openings were available at Fairfield NRC, and that Neel's effective date of separation from employment was December 2, 2009. (*Id.* ¶ 18.) Additional facts will be developed in the analysis that follows.

In count one of her complaint, Neel claimed that her termination was in violation of the FMLA, 29 U.S.C. § 2615(a), that Mid-Atlantic's conduct was willful and wanton and/or done with malice and reckless disregard of Neel's rights under the FMLA, that Mid-Atlantic's conduct was not in good faith, that Mid-Atlantic lacked reasonable grounds for believing its conduct was not in violation of the FMLA, and that Mid-Atlantic's conduct proximately caused Neel's economic losses. (*Id.* ¶¶ 25–28.) Neel also contended that Mid-Atlantic's termination of her amounted to retaliation against her for asserting her rights under the FMLA, which thereby constituted a violation of Maryland's public policy; in count two, Neel claimed both economic and noneconomic damages. (*Id.* ¶¶ 29–34.)

Mid-Atlantic denied it violated the FMLA and averred that it conducted itself in good faith based upon legitimate business and economic reasons and based upon legal advice.

(Answer ¶¶ 25–27.)  Further, Mid-Atlantic contested that Neel had a "serious health condition," within the meaning of the FMLA, that rendered her incapacitated from working due to either her condition or treatment.  (*Id.* 2nd Defense.)  Additionally, Mid-Atlantic alleged that Neel's at-will employment was properly terminated for legitimate business, economic, and performance reasons, that the termination was made in good faith without malice, and that the termination was not retaliatory or related to Neel's FMLA leave.  (*Id.* 3rd Defense.)

## II. Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)).  The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  However, the "mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to defeat a defendant's motion for summary judgment.  *Id.* at 252.  The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1).  Supporting and opposing affidavits are to be made on personal

knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Rule 56(c)(4).

## III. Analysis

Congress passed the Family and Medical Leave Act in 1993 to accomplish multiple, related purposes, including the balancing of workplace demands with family needs and personal health needs while accommodating the legitimate interests of employers and minimizing the potential for employment discrimination. 29 U.S.C. § 2601(b). The Act includes prescriptive rights and protections as well as proscriptive provisions that are designed to protect employees from discrimination or retaliation for their exercise of substantive rights under the FMLA. *Yashenko v. Harrah's*, 446 F.3d 541, 546 (4th Cir. 2006). Claims arising under 29 U.S.C. § 2615(a)(1) are referred to as "interference" or "entitlement" claims because that section states, "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." *Id.* Additionally, "retaliation" or "discrimination" claims may be brought under 29 U.S.C. § 2615(a)(2) which states, "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."

### A. Serious Health Condition

In Neel's case, she asserted an entitlement to leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Pertinent to this case, "serious health condition" is defined to mean an illness, injury, impairment, or physical or mental condition that involves continuing treatment by a health care provider. 29 U.S.C. § 2611(11)(B). The regulations

promulgated by the U.S. Department of Labor offer further definition of the term "continuing treatment":

> A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:
> (a) Incapacity and treatment. A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
> (1) Treatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
> (2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.
> (3) The requirement in paragraphs (a)(1) and (2) of this section for treatment by a health care provider means an in-person visit to a health care provider. The first (or only) in-person treatment visit must take place within seven days of the first day of incapacity.
> (4) Whether additional treatment visits or a regimen of continuing treatment is necessary within the 30-day period shall be determined by the health care provider.
>
> . . .
>
> (c) Chronic conditions. Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:
> (1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;
> (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
> (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).
>
> . . .
>
> (e) Conditions requiring multiple treatments. Any period of absence to receive multiple treatments (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, for:
> (1) Restorative surgery after an accident or other injury; or

(2) A condition that would likely result in a period of incapacity of more than three consecutive, full calendar days in the absence of medical intervention or treatment, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), or kidney disease (dialysis).

29 C.F.R. § 825.115.

Further, the term "incapacity" is defined as "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore [sic], or recovery therefrom." 29 C.F.R. § 825.113(b). Also, the regulations define "treatment" in the following manner:

> The term "treatment" includes (but is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations. A regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition (e.g., oxygen). A regimen of continuing treatment that includes the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider, is not, by itself, sufficient to constitute a regimen of continuing treatment for purposes of FMLA leave.

29 C.F.R. § 825.113(c).

Mid-Atlantic argues that Neel's condition did not qualify as a "serious health condition" because she did not satisfy the regulation's requirement of either "incapacity and treatment," "chronic conditions," or "conditions requiring multiple treatments." Although Neel argues she meets each of the three definitions, her circumstances only need to satisfy one of these definitions in order to resolve the threshold issue of FMLA eligibility.[2]

---

[2] It is somewhat bothersome to the Court that Mid-Atlantic has only advanced the proposition that Neel did not have a serious health condition in litigation long after Mid-Atlantic considered and granted Neel's request for FMLA leave and long after Neel, in undoubted reliance upon Mid-Atlantic's approval, took the leave to which she believed she was entitled. If Mid-Atlantic did not consider Neel to have a serious health condition, then it should have denied her request for FMLA leave. Other courts have invoked the doctrine of equitable estoppel in similar circumstances. *See, e.g., Podkovich v. Glazer's Distribs. of Iowa*, 446 F. Supp. 2d 982,

Mid-Atlantic does not dispute that Neel began experiencing neck and shoulder pain in early 2009 or that Dr. Damean Freas indicated a possible diagnosis of cervical spondylosis for Neel at that time. (Def.'s Opp. 2, ECF No. 23.) Mid-Atlantic also does not dispute that Neel had two sets of trigger-point injections in March 2009 and thereafter had other treatments from Dr. Freas on May 11, June 19, July 23, August 21, and September 1, 2009. (*Id.* 3.) The treatment on June 19 was a cervical epidural steroid injection. (Def.'s Mot. Summ. J. Ex. 5, Freas Dep. 22:14-15, Oct. 6, 2010, ECF No. 20.) Dr. Freas explained that a trigger-point injection is superficial because it is into the muscle, whereas a cervical epidural injection is into the epidural space around the spine. (*Id.* 20:12-17.) He further explained that the latter requires "putting a large needle through lots of muscles into the spine." (*Id.* 24:19-20.)

Dr. Freas saw Neel again on July 20 after Neel's pain had begun to return, and the two discussed the possibility of another cervical epidural injection as well as Botox injections, which might loosen some of the muscle spasm Neel was experiencing. (*Id.* 22:22—23:11.) Dr. Freas administered a cervical epidural injection on July 23 (*id.* 23:21—24:1), trigger-point injections on August 21 (*id.* 25:10-11), a Botox injection on September 21 (*id.* 27:10-11), and a cervical facet joint injection on September 24 (*id.* 29:1-2). He administered a cervical epidural steroid injection on October 8 (*id.* 44:17-19), examined Neel on November 3 (*id.* 45:9-11), and gave her a cervical selective nerve root block on November 24 (*id*. 46:15-18).

Dr. Freas discussed with Neel at some point between March 9 and September 24, 2009, the possibility of Neel's taking time off from work to get treatment, but her initial response was that she wanted to continue working. (*Id.* 29:17—30:14.) The treatment that Dr. Freas indicated he discussed with Neel was cervical steroid procedures in a series of three, spread out one month

---

1002-03 (N.D. Iowa 2006) (collecting cases; finding evidence sufficient for plaintiff to go to jury on equitable estoppel). However, Neel has not advanced this argument, and the Court declines to do so for her.

apart, plus physical therapy. (*Id.* 31:17—32:4.) A neurologist who examined Neel determined that she had ulnar nerve entrapment. (*Id.* 21:6-19.) Only physical therapy or a surgical procedure would solve that problem. (*Id.* 21:20—22:5.) Dr. Freas also indicated that the automobile accident Neel had on September 8 significantly exacerbated her symptoms. (*Id.* 27:2-9.) Following her accident, he ordered an MRI, which disclosed a disk protrusion at C5-C6 that was flattening the ventral thecal sac; Dr. Freas believed that to be a new development. (*Id.* 28:3-15.)

Mid-Atlantic disputes that Neel's symptoms were exacerbated by the accident because she did not receive treatment until September 21 and because it claims no evidence exists that Neel's condition was worse on September 24 than it was on March 9, the date of Neel's first treatment. (Def.'s Opp. Mem. 4.) Also, Mid-Atlantic says that Neel's treatment protocol did not change after her accident. The most important fact before the Court in this regard is Dr. Freas's statement that the MRI disclosed a new condition that, to his knowledge, did not exist before the accident. When Neel received treatment after the accident and whether the treatment varied from her pre-accident treatment do not overshadow Dr. Freas's observation of the new development in Neel's spine. The latter seems fairly conclusive on the point.

Thus, whether Neel's circumstances fit any of the three definitions for a serious health condition involving continuing treatment by a health care provider must be decided. The first definition requires a period of incapacity of *more than three* consecutive, full calendar days. 29 C.F.R. § 825.115(a). Neel seems to contend that she was incapacitated for that period of time after her accident. However, she testified that she worked a partial day on September 8, 2009, and that she was off from work on September 9 and 10. (Def.'s Mot. Summ. J. Ex. 1, Neel Dep. 73:13-17, Sept. 28, 2010, ECF No. 20.) She was cleared by the physician at the hospital emergency department to return to work on September 11. (Pl.'s Mot. Summ. J. Ex. 5, ECF

9

No. 19.) That length of time does not meet the definition's requirement of incapacity of more than three consecutive, full calendar days. Alternatively, Neel argues that Dr. Freas deemed her unable to work because he recommended she take time off in order to get the steroid injections and physical therapy. The Court is not persuaded that Dr. Freas's recommendation of time off from work rises to the level of deeming Neel incapacitated to work. The case that she cites for authority on this point does not help her. In *Price v. City of Fort Wayne*, 117 F.3d 1022, 1025 (7th Cir. 1997), the court opined that a doctor's order that plaintiff not work for three weeks easily surpassed section 825.115(a)'s requirement of four or more consecutive days of incapacity. Neel has provided no evidence that she was ordered by her physician not to work, thus distinguishing her case from the Seventh Circuit's decision in *Price*.

Neel further argues that she had a chronic condition, as defined by section 825.115(c). This is a more successful argument. No particular length of incapacity or treatment is required for a chronic condition. Neel's many visits to Dr. Freas for examination and treatment in 2009 appear to satisfy the necessity for "periodic visits" (defined as at least twice a year) for treatment by a health care provider. Additionally, the condition must continue over an extended period of time, including recurring episodes of a single, underlying condition. Neel's neck injury, which seemed to get better and worse over a period of months, satisfies this requirement. Finally, a chronic condition may cause episodic rather than a continuing period of incapacity. Again, the ebb and flow of Neel's condition appears to meet this parameter.

As well, the third definition of serious health condition at issue between the parties, i.e., that of a condition requiring multiple treatments, section 825.115(e), is reflected in the evidence before the Court. Neel's period of absence to receive the steroid injections and to undergo physical therapy fits well within this definition's preliminary criteria. Mid-Atlantic takes issue with whether Neel's case meets the applicable subpart of section 825.115(e)(1), "restorative

surgery after an accident or other injury," and argues that the steroid injections neither qualified as nor were related to restorative surgery. (Def.'s Opp. 16.) Since the phrase "restorative surgery" is not defined in the regulation, resort to a dictionary is in order. The adjectival definition of "restorative" is "tending to restore strength or health; capable of restoring or renewing." *Oxford English Dictionary* (Third edition, March 2010; online version March 2011), http://www.oed.com/viewdictionaryentry/Entry/163989. The word "surgery" is defined to mean the following: "The art or practice of treating injuries, deformities, and other disorders by manual operation or instrumental appliances; surgical treatment." *Id.*, http://www.oed.com/view/Entry/194929?redirectedFrom=surgery#eid. Given the breadth of these definitions, the course of treatment in Neel's case consisting of the steroid injections and physical therapy appears also to satisfy the meaning of a "condition requiring multiple treatments." Consequently, the Court concludes Mid-Atlantic's argument that Neel does not provide evidence of a serious health condition within the meaning of the FMLA has no merit.

### B. Compliance by Mid-Atlantic with FMLA

Neel contends Mid-Atlantic violated the FMLA. Specifically, she argues Mid-Atlantic was obligated to reinstate her to her position upon her return from FMLA leave (Pl.'s Mot. Summ. J. 11), and she argues Mid-Atlantic failed to comply with FMLA's notice requirements in two respects: one, Mid-Atlantic did not give the required explanation of the basis for its statement it would suffer grievous economic injury if it were to restore her to her position; and two, Mid-Atlantic did not give her, in its notice of intention not to reinstate her, a reasonable opportunity for her to return to work (*id.* 14-15). Additionally, Neel asserts Mid-Atlantic both interfered with the exercise of her FMLA rights and retaliated against her for the exercise of her FMLA rights by terminating her. (*Id.* 15-16.)

11

### *1. Obligation to Reinstate*

The statute is written in mandatory terms when it addresses an employer's obligation to reinstate an employee who properly takes FMLA leave: "[A]ny eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave *shall be entitled*, on return from such leave—(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a) (emphasis added). The law also provides a "key employee" exemption under which an employer may deny restoration of the employee either to the employee's prior position or to an equivalent position. This exemption rests on the satisfaction of three conditions:

> (A) such denial is necessary to prevent substantial and grievous economic injury to the operations of the employer;
> (B) the employer notifies the employee of the intent of the employer to deny restoration on such basis at the time the employer determines that such injury would occur; and
> (C) in any case in which the leave has commenced, the employee elects not to return to employment after receiving such notice.

29 U.S.C. § 2614(b)(1). Neel does not dispute that she was a key employee but argues Mid-Atlantic is not entitled to claim the exemption. (Pl.'s Mot. Summ. J. 12-13.)

An employer is required to give two types of notice to a key employee. Under 29 C.F.R. § 825.219(a),

> An employer who believes that reinstatement may be denied to a key employee, must give written notice to the employee at the time the employee gives notice of the need for FMLA leave (or when FMLA leave commences, if earlier) that he or she qualifies as a key employee. At the same time, the employer must also fully inform the employee of the potential consequences with respect to reinstatement and maintenance of health benefits if the employer should determine that substantial and grievous economic injury to the employer's operations will result if the employee is reinstated from FMLA leave. If such notice cannot be given immediately because of the need to determine whether the employee is a key employee, it shall be given as soon as practicable after being notified of a need for leave (or the commencement of leave, if earlier). It is

12

expected that in most circumstances there will be no desire that an employee be denied restoration after FMLA leave and, therefore, there would be no need to provide such notice. However, an employer who fails to provide such timely notice will lose its right to deny restoration even if substantial and grievous economic injury will result from reinstatement.

At the time Neel requested FMLA leave, Mid-Atlantic provided her with a form, dated October 6, 2009, entitled, "Notice of Eligibility and Rights & Responsibilities (Family and Medical Leave Act." (Pl.'s Mot. Summ. J. Ex. 8.) This form, which was WH-381 devised by the Wage and Hour Division, Employment Standards Administration, in the U.S. Department of Labor, had several blanks checked or filled. The information pertinent to resolution of this case included Mid-Atlantic's determination that Neel was eligible for FMLA leave, its acceptance of sufficient certification to support Neel's leave request, its notification to Neel that she was required to furnish Mid-Atlantic with periodic reports every four weeks of her status and intent to return to work, and its notification of the following:

> Due to your status within the company, you are considered a "key employee" as defined in the FMLA. As a "key employee," ***restoration to employment may be denied*** following FMLA leave on the grounds that such restoration will cause substantial and grievous economic injury to us. We have determined that restoring you to employment at the conclusion of FMLA leave will cause substantial and grievous economic harm to us.

(*Id.* (emphasis added).) The quoted notification from WH-381 appears sufficient to discharge Mid-Atlantic's responsibilities under section 825.219(a).

A different subsection of this same regulation requires another type of notice:

> As soon as an employer makes a good faith determination, based on the facts available, that substantial and grievous economic injury to its operations will result if a key employee who has given notice of the need for FMLA leave or is using FMLA leave is reinstated, the employer shall notify the employee in writing of its determination, that it cannot deny FMLA leave, and that ***it intends to deny restoration to employment on completion of the FMLA leave***. It is anticipated that an employer will ordinarily be able to give such notice prior to the employee starting leave. The employer must serve this notice either in person or by certified mail. ***This notice must explain the basis for the employer's finding that substantial and grievous economic injury will result, and, if leave has***

> *commenced, must provide the employee a reasonable time in which to return to work, taking into account the circumstances, such as the length of the leave and the urgency of the need for the employee to return*.

29 C.F.R. § 825.219(b) (emphasis added).

Mid-Atlantic has argued that its notification under subsection (a) sufficed as notification under subsection (b). (Def.'s Mot. Summ. J. 20-21, ECF No. 20; Def.'s Opp. 21-23, ECF No. 23.) The plain language of the two subsections does not support Mid-Atlantic's argument. Whereas subsection (a) requires an employer to notify a key employee that it *may deny* reinstatement following FMLA leave, subsection (b) requires an employer to notify a key employee it *intends to deny* reinstatement. The difference in language here is the difference between "perhaps" and "definitely." Beyond that marked difference in statement of intent to deny restoration, subsection (b) places additional requirements for notification upon the employer. Notably, nowhere in the WH-381 notice from Mid-Atlantic to Neel is the required explanation of the basis for Mid-Atlantic's finding that substantial and grievous economic injury will result. Mid-Atlantic's failure to provide Neel with a clear statement of intent to deny restoration deprived Neel of an important right under the FMLA and, as important, deprived her of an opportunity to weigh whether taking FMLA leave was in her best interest.

Mid-Atlantic asserts another court held that a WH-381 form was sufficient notice under 29 U.S.C. § 2614(b), citing *Thurston v. Cherry Hill Triplex*, No. 06-3862 (JBS), 2008 U.S. Dist. LEXIS 60936 (D.N.J. Aug. 5, 2008). *Thurston* most assuredly does not stand for such a proposition. The notice at issue in that case was held sufficient to meet the requirements of 29 C.F.R. § 825.301(b)(1), as it existed before January 16, 2009.[3] The regulatory notice at issue in

---

[3] The former wording of this regulation was the following:

> The employer shall also provide the employee with written notice detailing the specific expectations and obligations of the employee and explaining

14

*Thurston* is now embodied in 29 C.F.R. § 825.300(c), and this Court agrees that WH-381 suffices as notice under section 825.300(c). That does not mean, however, that WH-381 is sufficient notice under 29 U.S.C. § 2614(b)(1) or 29 C.F.R. § 825.219(b), the regulation that interprets 29 U.S.C. § 2614(b)(1). This is not to say that a particular notice could never suffice under both subsections of 29 C.F.R. § 825.219, but the wording before the Court in WH-381 does not address the concerns expressed in subsection (b) and, therefore, is held not to suffice as proper notice thereunder.

---

any consequences of a failure to meet these obligations. The written notice must be provided to the employee in a language in which the employee is literate (see § 825.300(c)). Such specific notice must include, as appropriate:

(i) that the leave will be counted against the employee's annual FMLA leave entitlement (see § 825.208);

(ii) any requirements for the employee to furnish medical certification of a serious health condition and the consequences of failing to do so (see § 825.305);

(iii) the employee's right to substitute paid leave and whether the employer will require the substitution of paid leave, and the conditions related to any substitution;

(iv) any requirement for the employee to make any premium payments to maintain health benefits and the arrangements for making such payments (see § 825.210), and the possible consequences of failure to make such payments on a timely basis (i.e., the circumstances under which coverage may lapse);

(v) any requirement for the employee to present a fitness-for-duty certificate to be restored to employment (see § 825.310);

(vi) the employee's status as a "key employee" and the potential consequence that restoration may be denied following FMLA leave, explaining the conditions required for such denial (see § 825.218);

(vii) the employee's right to restoration to the same or an equivalent job upon return from leave (see §§ 825.214 and 825.604); and,

(viii) the employee's potential liability for payment of health insurance premiums paid by the employer during the employee's unpaid FMLA leave if the employee fails to return to work after taking FMLA leave (see § 825.213).

Although Mid-Atlantic's notice to Neel before she began her FMLA leave did not comply with 29 U.S.C. § 2614(b)(1) or 29 C.F.R. § 825.219(b), it must be considered whether any other communication from Mid-Atlantic so complied. Mid-Atlantic and Neel have both indicated they communicated through email and regular mail after she started leave on October 8, 2009. On October 13, 2009, Neel communicated to her supervisor, Grillo, and Alley in the human resources department that she planned to return to work within six to ten weeks. (Def.'s Mot. Summ. J. Ex. 6, ECF No. 20.) If this email triggered a response from Mid-Atlantic, it has not been provided to the Court. Neel emailed them again on November 4, 2009, updating them on her treatment and reiterating her hope of being able to return to work within six weeks. (*Id.* Ex. 7.) Alley responded the next day, thanking Neel for the update. (*Id.*) Grillo responded a few days later, also thanking her for the update and saying, "As you get closer to being released to work, we can discuss your options." (*Id.* Ex. 8.)

On November 25, 2009, Neel emailed Grillo and Alley with another update, notifying them that her follow-up appointment had been changed from December 2 to December 9 and indicating that she hoped to return to work approximately December 14, perhaps with some restrictions on number of hours of work and how far she could drive; she further indicated she would let them know the outcome of her appointment and her expected return date. (*Id.* Ex. 9.) In a letter dated December 1, 2009, Alley responded, in part:

> I want to remind you that shortly before you began your leave of absence, I sent you a letter acknowledging your time off and explained Mid-Atlantic's position as per the FMLA. I explained that as the facility's administrator, you were a "key" employee and, as such, Mid-Atlantic could not guarantee your reinstatement. Since my letter, Mid-Atlantic has identified a successor to the administrator position, who is scheduled to begin work in mid-December.

(*Id.* Ex. 10.)

Although Alley's letter refers to a letter sent to Neel before she began her FMLA leave, Mid-Atlantic has not supplied the Court with a copy of that letter. It is possible, indeed probable, that the reference was not to a letter per se but to the form WH-381 since the message Alley says she conveyed earlier is consistent with the wording of that form. If so, then it has already been concluded by the Court to be inadequate notice under 29 U.S.C. § 2614(b)(1) or 29 C.F.R. § 825.219(b). Thus, it appears that Mid-Atlantic's first, clear statement to Neel of its intent to deny job restoration to Neel was this December 1, 2009, letter. Measured against the applicable statute and regulation, this letter falls significantly short of proper notification. It, too, fails to explain a basis for Mid-Atlantic's determination of substantial and grievous economic injury to its operations that would be caused by reinstatement of Neel. *See* 29 U.S.C. § 2614(b)(1)(B), 29 C.F.R. § 825.219(b). Moreover, it fails to offer Neel a reasonable time in which to return to work. 29 C.F.R. § 825.219(b). Indeed, this letter is explicit that it has already hired a replacement for Neel, the culmination of a hiring search that began, unbeknownst to Neel, as soon as Neel began her FMLA leave. (Def.'s Mot. Summ. J. Ex. 1, Dep. Neel 102:9—103:22; Ex. 2, Dep. Alley 121:3-16, June 15, 2010.)

Neel emailed Grillo on December 9, 2009, that she had been released to return to work without restrictions on December 16, 2009; she also inquired what she would be doing when she reported for work on that date. (*Id.* Ex. 11.) Alley wrote back on December 11, 2009, saying *inter alia*:

> Perhaps you misunderstood the content of my December 2, 2009 communication. Your position has been filled. At this time, there are no alternative openings for you at the facility.
>
> Your effective separation date of employment with Mid-Atlantic is December 2, 2009. Should a future opening at this nursing home come available, you are invited to apply for such position. You will be notified in a separate letter regarding your COBRA rights.

> Please let me know if there is anything we can do to assist you with finding future employment.

(*Id.* Ex. 12.)

The Court concludes that Mid-Atlantic interfered with Neel's FMLA rights by failing to provide her proper notice of its unambiguous intent to deny restoration, by failing to explain to her the basis for its determination that restoration would cause Mid-Atlantic substantial and grievous economic injury to its operations, and by failing to offer her a reasonable time in which to return to work after notification of its intent to deny restoration. Correspondingly, Mid-Atlantic is not entitled to claim the "key employee" exemption, which rests upon compliance with the statute as interpreted by the DOL in its regulations.

Mid-Atlantic seems to claim that its hiring of a successor voids its statutory obligation to reinstate Neel. (Def.'s Opp. 20-21, ECF No. 23.) It relies upon the case of *Oby v. Baton Rouge Marriott*, 329 F. Supp. 2d 772 (S.D. La. 2004). Its reliance upon *Oby* is misplaced. In that case, the defendant hotel gave the plaintiff proper notification of its intent to deny reinstatement following her FMLA leave and gave her a reasonable time in which to return to work. *Id.* at 776. Mid-Atlantic did neither of these things. As a result, Mid-Atlantic had no legitimate basis for denying restoration of Neel's job to her.

### 2. Termination

Neel also asserts that Mid-Atlantic improperly terminated her because its reason for termination was her taking of FMLA leave. If such occurred, that would be a clear violation of the FMLA, 29 U.S.C. § 2615(a)(2). To support this assertion, Neel points to Grillo's deposition testimony regarding deficiencies, as he judged them to be, in Neel's performance:

> Q: Was Ms. Neel terminated because of any of these deficiencies?
>
> A: She was terminated because she had to take several months of leave.

> Q: Not because of her performance, then?
>
> A: We were in a position where we had a brand new unit that was set to open for the facility, and we had to have an administrator to handle that.
>
> Q: But my question is simply was her performance the reason that she was not continued on as an employee?
>
> A: Well, facility was in decline. So that contributed to it.
>
> Q: If she had not taken family medical leave, would she have been terminated?
>
> A: No.

(Pl.'s Mot. Summ. J. Ex. 18, Dep. Grillo 26:7—27:1, June 8, 2010, ECF No. 19.)

It is difficult to imagine a plainer statement of an employer's reason for termination of an employee because she had taken FMLA leave. Mid-Atlantic attempts to deflect liability by explaining that this quotation was taken out of context. The "context" in which Mid-Atlantic wishes Grillo's statement to be viewed is that Grillo also said that Neel was terminated because she was designated as a key employee, was notified of her key employee status, elected to take FMLA leave, and was replaced by Mid-Atlantic during the leave period. (Def.'s Opp. 24 n.6, citing Def.'s Mot. Summ. J. Ex. 4, Dep. Grillo 35-40, ECF No. 20.) Even if that is an accurate interpretation of what Grillo said, it does not help Mid-Atlantic avoid liability. As noted earlier, the notification that Mid-Atlantic actually gave to Neel before she took her leave did not explicitly convey an intent to deny restoration at the end of her FMLA leave. Relying upon inadequate statutory compliance is not an excuse for terminating an employee improperly, as Mid-Atlantic did here. Since Mid-Atlantic cannot legitimately rely upon proper FMLA notification as a basis for termination, it is left with the unvarnished agreement by Grillo with the statement that Neel would not have been terminated if she had not taken FMLA leave. That constitutes direct evidence of a violation of the FMLA, specifically, 29 U.S.C. § 2615(a)(2). No need exists to engage in the burden-shifting analysis employed in cases where direct evidence of

discriminatory employment actions is absent. *See, e.g., Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213-14 (4th Cir. 2007) (plaintiff may establish discrimination claim through direct or circumstantial evidence of improper motivating factor for employment decision or may utilize "pretext" framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

## *IV. Conclusion*

Based on the above analysis, the Court will enter summary judgment for Neel and against Mid-Atlantic on count one of the complaint. Count two of the complaint rests on a claim that Mid-Atlantic's improper discharge of Neel violates Maryland public policy. Perhaps it does, but neither party presents any argument on the point, so the Court considers it abandoned. Accordingly, summary judgment will be entered against Neel and for Mid-Atlantic on count two.

Although the issues of liability have been determined, further proceedings will still be necessary to determine remedies. Consequently, only partial summary judgment will be entered in a separate order.

DATED this 20th day of April, 2011.

BY THE COURT:

/s/
James K. Bredar
United States District Judge