**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**


ELIZABETH J. NEEL,               \*
                                       \*
           Plaintiff,        \*
                                       \*
           v.               \*        Case No. SAG-10-cv-405
                                       \*
MID-ATLANTIC OF FAIRFIELD, LLC,  \*
                                       \*
          Defendant.     \*

\* \* \* \* \* \*

**MEMORANDUM OF DECISION**

Plaintiff Elizabeth J. Neel, a licensed nursing home administrator, sued her former employer Mid-Atlantic of Fairfield, LLC ("Mid-Atlantic") for violation of the Family and Medical Leave Act ("FMLA" or "the Act"). Am. Compl. ¶¶ 10-14. Mid-Atlantic owns the Fairfield Nursing and Rehabilitation Center, the long-term care facility at which Ms. Neel worked. Mem. 1 (Bredar, J.), [ECF No. 25]. District Judge James K. Bredar, who was assigned this case for trial, granted summary judgment in Ms. Neel's favor on April 20, 2011. Mem. 20. Judge Bredar concluded that

> Mid-Atlantic interfered with Neel's FMLA rights by failing to provide her proper notice of its unambiguous intent to deny restoration, by failing to explain to her the basis for its determination that restoration would cause Mid-Atlantic substantial and grievous economic injury to its operations, and by failing to offer her a reasonable time in which to return to work after notification of its intent to deny restoration. . . . Mid-Atlantic had no legitimate basis for denying restoration of Neel's job to her.

*Id.* at 18. Judge Bredar also determined that Mid-Atlantic unlawfully terminated Ms. Neel because she had taken FMLA leave. *Id.* at 19. The case proceeded to trial to ascertain the remedies available to Ms. Neel. *Id.* at 20. The parties consented to referral of the case to a magistrate judge. [ECF No. 69]. This Court tried the case on February 22, 23, and 24, 2012, for

the sole purpose of determining Ms. Neel's damages and the appropriate remedies. (ECF Nos. 85, 86, 88.)

For the following reasons, the Court finds that Mid-Atlantic owes Ms. Neel $253,340.76 in damages, plus reasonable attorneys' fees.

## I.      Findings of Fact

The Court finds the facts stated herein based upon its evaluation of the evidence, including the credibility of witnesses, and the inferences that the Court has found reasonable to draw from the evidence.

1.  Ms. Neel is a nursing home administrator licensed by the State of Maryland. Testimony of Elizabeth Neel ("Neel Test.") 20:4-9, Feb. 22, 2012.

2.  Ms. Neel has worked in assisted living facilities since at least 1999.  Neel Test. 21:5-6.

3.  In February, 2002, Ms. Neel was hired by HCR ManorCare for the company's administrator-in-training program.  Neel Test. 21:6-7; Def.'s Exh. 33.

4.  In April, 2003, after Ms. Neel had obtained her administrator's license, she became the licensed nursing home administrator for HCR ManorCare's Dulaney facility in Towson, Maryland.  Ms. Neel worked at ManorCare's Dulaney facility for approximately nineteen (19) months.  Neel Test. 21:8-13, 66:9-15; Def.'s Exh. 33.

5.  In November, 2004, Ms. Neel became the licensed nursing home administrator for HCR ManorCare's Roland Park facility in Baltimore, Maryland.   Ms. Neel worked at ManorCare's Roland Park facility for approximately sixteen (16) months.   Neel Test. 21:10-13, 66:2-8; Def.'s Exh. 33.

6.  Ms. Neel left her position at ManorCare's Roland Park facility when she was recruited to become an administrator at one of FutureCare Health & Management's facilities.  Neel Test. 21:13-20.

7.  Ms. Neel worked at FutureCare's Chesapeake facility for approximately twenty-six (26) months.  Ms. Neel served as the care manager of the facility for four (4) months, then became the facility's licensed nursing home administrator.  Neel Test. 21:6-22:1, 66:6-8; Def.'s Exh. 33.

8.  In May, 2008, Mid-Atlantic hired Ms. Neel to serve as the licensed nursing home administrator for the Fairfield Nursing and Rehabilitation Center. Neel Test. 21:25-22:1.

9.  Mid-Atlantic is a subsidiary of Mid-Atlantic Health Care, LLC.  Testimony of Jeff Grillo ("Grillo Test."), 5:10-17.

10. The Fairfield Nursing and Rehabilitation Center is located at 1454 Fairfield Loop Road in Crownsville, Maryland.  Def.'s Exh. 9.

11. When Ms. Neel was hired by Mid-Atlantic, her compensation package included: $120,000 annual salary; a bonus of up to 25% of her previous year's earnings; health insurance; and eligibility for a 401(k) plan after one year of service.  Neel Test. 22:12-17; Pl.'s Exh. 1.

12. Ms. Neel's salary was subject to increase following annual performance evaluations. These performance evaluations were supposed to be held each May, near the anniversary of Ms. Neel's employment.  Testimony of Traci Alley ("Alley Test."), 192:16-23, Feb. 22, 2012.

13. From May, 2008 through December, 2008, Ms. Neel earned $71,538.30 in gross salary, paid out in bi-weekly installments of $4,615.38.  Neel Test. 24:11-14; Pl.'s Exh. 2, 3.

14. In April, 2009, Ms. Neel received a bonus of $10,731.00, which represented fifteen (15) percent of her 2008 yearly gross earnings. Neel Test. 25:5-17.

15. Ms. Neel also received a three (3) percent salary increase in 2009.  Ms. Neel's salary was paid out in bi-weekly installments of $4,754.40, totaling $123,614.00.  Neel Test. 25:21-26:9, 30:9-11; Pl's Exh. 4; *see also* Def.'s Exh. 45.

16. While employed at Mid-Atlantic, Ms. Neel received individual health insurance benefits from Kaiser Permanente.  Mid-Atlantic paid Ms. Neel's entire health insurance premium of $541.22 per month.  Ms. Neel did not contribute to her health insurance premium. Neel Test. 27:4-15; Pl.'s Exh. 5.

17. As of December 1, 2009, Mid-Atlantic required that its employees contribute to their health insurance premiums. Alley Test., 179:21-180:10.

18. Had Ms. Neel continued to be employed at Mid-Atlantic, she would have had to contribute $50 per pay period to her health insurance premium, beginning with the first pay period in December 2009.  Alley Test., 180:7-10.

19. Ms. Neel was married on September 25, 2009.  Neel Test. 27:1.

20. After her wedding, Ms. Neel planned to add her husband to her health insurance coverage at Mid-Atlantic.  However, Ms. Neel did not add her husband to her health insurance plan in the time period between returning from her honeymoon and leaving on her approved FMLA leave.  Neel Test. 28:2-8.

21. When she left for her unpaid FMLA leave, Ms. Neel's intention was to add her husband to her health insurance coverage when she returned to work.  Neel Test. 28:2-8.

22. Under the terms of Mid-Atlantic's health insurance plan, insured employees may not make changes to their coverage at any time.  Rather, those insured employees who wish

to add a spouse to their plan must do so within thirty (30) days of their marriage.  Alley Test., 164:4-15.

23. On October 5, 2009, Ms. Neel notified Mid-Atlantic that she needed to take unpaid FMLA leave to treat a neck injury she had suffered.  Alley Test., 162:20-25.

24. Also on October 5, 2009, Mid-Atlantic Health Care's chief operating officer, Jeff Grillo, and the company's human resources director, Traci Alley, spoke with employment attorney Laura Rubenstein regarding Ms. Neel's FMLA request.  Testimony of Laura Rubenstein ("Rubenstein Test."), 8:10-11, 10:1-16, Feb. 24, 2012;  Grillo Test., 21:5-16; Alley Test., 165:6-169:24.

25. Ms. Alley is very familiar with the FMLA, having attended seminars on the topic, read both the Act and its accompanying regulations, and researched FMLA-related issues on websites operated by the U.S. Department of Labor and the Equal Employment Opportunity Commission.  Alley Test., 151:6-152:4.

26. Ms. Rubenstein is also very familiar with FMLA and its implementing regulations, as she gives advice to clients on the Act, keeps abreast of current case law, lectures and teaches seminars about the Act, has assisted in drafting a book on the Act, and has read the Act and its implementing regulations more than once.  Rubenstein Test. 6:1-7:17.

27. During their October 5 conversation, Ms. Rubenstein, Ms. Alley, and Mr. Grillo determined that Ms. Neel qualified as a "key employee" under the Act.  They further determined that Mid-Atlantic would have to grant FMLA leave to Ms. Neel, but that the company need not necessarily restore Ms. Neel to her position after her FMLA leave ended.  Rubenstein Test., 14:2-7.

28.  Ms. Neel began her unpaid FMLA leave on October 6, 2009.  She expected to return to work at Mid-Atlantic in December, 2009.  Neel Test. 28:2-24, 30:9-30:11; Neel Dep. 99:8-101:8, 115:14-16, Sept. 28, 2010.

29. During her absence from work, Ms. Neel kept her supervisor, Jeff Grillo, and Mid-Atlantic human resources personnel apprised of both her medical recovery and the date by which she expected to return to work. Def.'s Exh. 8.

30.  On November 25, 2009, Ms. Neel emailed Ms. Alley and Mr. Grillo to inform them that she expected her doctor to approve her return to work on or around December 14, 2009. Def.'s Exh. 8.

31. After receiving Ms. Neel's November 25 email, Ms. Alley again sought Ms. Rubenstein's advice. Alley Test. 174:15-177:1.

32. As a result of her November 25 conversation with Ms. Alley, Ms. Rubenstein prepared a letter to Ms. Neel under Ms. Alley's signature. That letter, dated December 1, 2009, noted that Mid-Atlantic had identified Ms. Neel as a key employee under FMLA and had notified her of her key employee status in October, 2009.  The December 1 letter also stated that Mid-Atlantic had "identified a successor" to Ms. Neel's position.  Pl.'s Exh. 6.

33. On December 9, 2009, Ms. Neel again wrote to Ms. Alley and Mr. Grillo.  In this email, she stated that her doctor had released her to return to work without restrictions on December 16, 2009.  Def.'s Exh. 8.

34. After receiving the December 9 email, Ms. Alley again consulted Ms. Rubenstein. As a result of their conversation, Ms. Rubenstein prepared another letter to Ms. Neel that was sent under Ms. Alley's signature on December 11, 2009.  Rubenstein Test. 22:22-25:12.

35. The December 11 letter stated that, "Your position has been filled.  At this time, there are no alternative openings for you at the facility."  The letter informed Ms. Neel that her "effective separation date of employment with Mid-Atlantic is December 2, 2009." Def.'s Exh. 9.

36. After Ms. Neel received the December 11 letter informing her of her separation date from Mid-Atlantic, Ms. Neel launched a search for a new job. Neel Test. 31:11-23.

37. Ms. Neel's job search spanned several months.  During that time, she looked for long-term care jobs on CareerBuilder.com, Monster.com, and Jobs.com; contacted colleagues in the industry; sent letters to long term care companies that did not have published job openings; and applied for jobs online.  Neel Test. 31:16-39:1.

38. Ms. Neel applied for the following positions, among others:

    a.   Director of electronic records, MRI Network;

    b.   Director of operations, Chimes Baltimore;

    c.   Benefits manager, Bravo Health;

    d.   Hospital liaison, Mid-Atlantic of Fairfield;

    e.   Interim program manager, Bravo Health;

    f.   Director of case management, a staffing solutions group;

    g.   Medical records site coordinator;

    h.   Director of health operations, KePRO;

    i.   Provider relations representative, United Healthcare;

    j.   Health sales representative, Bravo Health;

    k.   Corporate wellness director;

    l.   Executive director of assisted living, Lighthouse Corporation; and

  m. Licensed nursing home administrator, Collington Episcopal Life Care Community.

Neel Test. 20:7-8, 35:2-44:4.

39. In December, 2009, Ms. Neel began training to become an independent insurance broker. Neel Test. 39:19-40:7.

40. Ms. Neel became an independent insurance broker with Insphere Insurance Solutions in February, 2010.  Neel Test. 40:4-7.

41. Ms. Neel earned $7,182.23 in gross profits as an insurance broker with Insphere.  On her 2010 tax return, she reported related expenses in the amount of $11,406.00.  According to Ms. Neel's 2010 tax return, her work as an insurance broker resulted in a net loss.  Pl.'s Exhs. 15, 16; Neel Test. 52:8-21.

42. In June, 2010, Ms. Neel was offered a position as a corporate wellness director at a company located near Rockville, Maryland.  Neel Test. 43:4-17, 67:7-13.

43. The corporate wellness director position included a salary of $75,000-$80,000 per year. Neel Test. 43:4-17, 67:7-13.

44. Ms. Neel rejected the corporate wellness director position that she was offered because she felt it was too far away from her home in Severna Park, Maryland.  Ms. Neel believed that her daily commute to the company's offices would have been about ninety minutes in each direction.  Neel Test. 30:1, 43:7-13.

45. In late July or early August of 2010, Ms. Neel learned that she was one of the two final candidates for a position as the executive director of an assisted living community run by the Lighthouse Corporation ("Lighthouse").  Neel Test. 43:18-25.

46. The executive director position at the Lighthouse community offered a salary of about $80,000 per year.  Neel Test. 44:8.

47. The Lighthouse community was located in an area that was a "fair drive" from Ms. Neel's home.  The community also was struggling with a resident population that fell below industry-wide standards.  Neel Test. 44:5-7.

48. At the same time that Ms. Neel was being considered for the position at the Lighthouse community, she was also being considered for a position as the licensed nursing home administrator for the Collington Episcopal Life Care Community ("Collington").  Neel Test. 43:25-44:18.

49. As compensation for its licensed nursing home administrator position, Collington offered a $95,000 annual salary, performance-based annual bonuses of up to fifteen (15) percent, health insurance benefits, and paid time off.  Neel Test. 44:12-18.

50. Ms. Neel withdrew her application for the Lighthouse position when she learned that she was the final candidate for the Collington position.  Ms. Neel chose to abandon her candidacy for the Lighthouse position because she believed that she would likely be offered the Collington position, and because she preferred Collington's benefits, location, and organizational health.  Neel Test. 44:3-18, 67:14-68:10.

51. Collington's executive director offered Ms. Neel the licensed nursing home administrator position in a letter dated August 25, 2010.  Pl.'s Exh. 13.

52. Ms. Neel accepted Collington's offer, and began work at Collington on September 1, 2010.  She remained employed at Collington through the date of this trial.  Pl.'s Exh. 13; Neel Test. 51:18-23.

53. Initially, Ms. Neel received bi-weekly gross salary payments of $3,653.85 from Collington.  Pl.'s Exh. 13.

54. Ms. Neel has received two bonuses while at Collington.  Neel Test. 51:5-16.

55. From September 1, 2010 through December 31, 2010, Ms. Neel earned $27,645.11 from Collington.  Pl.'s Exh. 14.

56. From January 1, 2011 through December 31, 2011, Ms. Neel earned $122,075.17 from Collington.  Pl.'s Exh. 18.

57. In September, 2011, Ms. Neel received a five (5) percent salary increase from Collington. Ms. Neel's current salary is $3,836.54 per biweekly pay period, or $99,750.04 per year. Pl.'s Exh. 17; Neel Test. 52:22-53:14.

58. After a ninety (90) day waiting period, on December 1, 2010, Ms. Neel became eligible for and enrolled in the health insurance plan that Collington offers.  Neel Test. 50:11-18.

59. Ms. Neel's health insurance benefits extend to both herself and her husband.  Neel Test. 50:19-24.

60. Ms. Neel contributes $128.59 per biweekly pay period to her health insurance coverage. Pl.'s Exh. 17.

61. Annually, Ms. Neel contributes $3,343.34 to the cost of the health insurance that she and her husband receive through Collington.  *See id.*

62. The health insurance coverage Ms. Neel receives through Collington is comparable to the health insurance she received through Mid-Atlantic in terms of medical treatment coverage and co-payment costs.  Neel Test. 50:25-51:4.

63. After Ms. Neel lost her job at Mid-Atlantic, she obtained individual health insurance coverage through COBRA.  Neel Test. 44:19-23.

64. Ms. Neel paid $981.03 for COBRA insurance coverage from December 10, 2009 through April 30, 2010. Pl.'s Exh. 10; Neel Test. 45:11-46:1.

65. Ms. Neel's COBRA insurance coverage was terminated effective April 30, 2010 because her May, 2010 payment check bounced. Pl.'s Exh. 10; Neel Test. 44:23-45:10.

66. After her COBRA coverage was terminated, Ms. Neel sought to obtain health insurance coverage from alternative sources.  Neel Test. 46:2-15.

67. Between May 1, 2010 and August 1, 2010, Ms. Neel had no health insurance coverage. Neel Test. 46:10-15.

68. While Ms. Neel was uninsured, she continued to be treated for her neck injuries.  These medical treatments, which were administered in May, June, and July, 2010, cost $1,914.82.  Neel Test. 46:16-47:17; Pl.'s Exh. 11.

69. Ms. Neel paid for this medical care herself.  Had she had health insurance coverage during the relevant time period, her health insurance would have paid for her treatment. Neel Test. 46:16-21.

70. Ms. Neel was accepted into the Maryland Health Insurance Program ("MHIP"), a state-run insurance program, effective August 1, 2010.  Neel Test. 46:4-9.

71. Ms. Neel paid a total of $1,280.00 ($320.00 per month) for MHIP coverage from August 1, 2010 through November 30, 2010.  Pl.'s Exh. 12; Neel Test. 48:21-23.

72. Ms. Neel cancelled her MHIP health insurance on November 30, 2010, because she obtained employer-based health insurance that began on December 1, 2010.  Neel Test. 48:17-20.

73. Mid-Atlantic froze all employee salaries effective February 1, 2010. Alley Test. 190:11-19; Def.'s Exh. 17.

74. In the letter announcing that pay raises would be suspended, the CEO of Mid-Atlantic Healthcare, LLC, Mid-Atlantic's parent company, stated that he would re-visit the issue every six months and would reinstate employee raises as soon as possible.  Def.'s Exh. 17.

75. At Mid-Atlantic, the turnover rate for licensed nursing home administrators is between two and three years.  The average length of an administrator's employment at Mid-Atlantic is 2.8 years.  Alley Test. 153:22-154:12; Grillo Test. 10:18-20.

76. At some time immediately prior to this trial, Mid-Atlantic provided Ms. Neel with a letter that offered her the position of Nursing Home Administrator at Chapel Hill Health Care, a nursing facility owned by Mid-Atlantic Health Care, LLC.  Def.'s Exh. 45.

77. The undated letter offers Ms. Neel an annual salary of $123,614.00, health insurance benefits, paid time off, and access to a company-sponsored 401(k) plan.  Def.'s Exh. 45.

78. The offer letter does not mention salary increases or a bonus structure.  The offer letter also does not specify the location of Chapel Hill Health Care.  Def.'s Exh. 45.

## II.     Conclusions of Law

Federal law provides that any employer who violates FMLA shall be liable to any eligible employee affected by the violation.  Family and Medical Leave Act, 29 U.S.C. § 2617(a)(1).  An employer who has violated FMLA is liable for damages equal to:

(i)     the amount of any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; . . .

(ii)    the interest on the amount described in clause (i) calculated at the prevailing rate; and

(iii)   an additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause (ii).

29 U.S.C. § 2617(a)(1)(A)(i)-(iii).  An employer may avoid liability for liquidated damages if it "proves to the satisfaction of the court that the act or omission which violated [FMLA] was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a [FMLA] violation . . . ."  29 U.S.C. § 2617(a)(1)(A)(iii).  An employer who has violated FMLA is also liable "for such equitable relief as may be appropriate, including employment, reinstatement, and promotion."  29 U.S.C. § 2617(a)(1)(B).

### A. Mid-Atlantic Owes Ms. Neel $116,030.02 in Lost Wages for the Time Period Running From December 2, 2009 Through the Date of this Verdict.

Ms. Neel seeks back pay to compensate her for the difference between (i) the wages and other compensation she would have earned at Mid-Atlantic from the date she was terminated at Mid-Atlantic through the date of this judgment, and (ii) her actual earnings during the same time frame.  Ms. Neel's proposed back pay calculations assume that she would have received a three (3) percent salary increase for each year of her continued employment at Mid-Atlantic.  Ms. Neel's calculations also assume that, for each year of her continued employment, she would have received a bonus in the amount of fifteen (15) percent of her previous year's salary.

Mid-Atlantic counters that this Court should reduce Ms. Neel's back pay award to the equivalent of sixty (60) days of lost wages because she failed to properly mitigate her damages.  Mid-Atlantic also suggests that any amount of lost wages owed to Ms. Neel should be reduced by the commissions she earned as an insurance broker during her unemployment period.  Finally, Mid-Atlantic argues that Ms. Neel's back pay calculations include speculative raise and bonus figures that should be omitted from this Court's back pay award.

### 1.  How the Court calculated Ms. Neel's back pay award.

To determine the appropriate back pay award in FMLA cases, the court calculates the wages the prevailing plaintiff would have earned had she remained in her original employment

through the date of the verdict, then subtracts any earnings that the plaintiff received during that time period.  *See Dollar v. Smithway Motor Xpress, Inc.*, 787 F. Supp. 2d 896, 917 (N.D. Iowa 2011); *Dillon v. Md.-Nat'l Capital Park & Planning Comm'n*, Civ. No. WGC-04-994, 2006 WL 5157076 at *20 (D. Md. Oct. 27, 2006); *see also Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1278 (4th Cir. 1985) (Title VII case); *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 489 (4th Cir. 1982) (ADEA case).  An employee who has been unlawfully discharged has a duty to mitigate her damages by being "reasonably diligent in seeking and accepting new employment substantially equivalent to that from which [s]he was discharged." *Brady*, 753 F.2d at 1273.  The employer bears the burden of demonstrating that the employee failed to mitigate damages.  *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1358 (4th Cir. 1995) (Title VII case); *Dillon*, 2006 WL 5157076 at *24.

Ms. Neel's proposed back pay calculations are, indeed, too speculative in regards to her suggested bonus payments and salary increases.  Mid-Atlantic froze employee salaries in February 1, 2010; there is no evidence to suggest that the freeze has been lifted.  In addition, Mid-Atlantic's bonuses are based on employee performance and other factors, such as the overall performance of the facility.  *See* Grillo Test. 53:9-18.  It is impossible for this Court to predict whether Ms. Neel would have received bonus payments had she remained at Mid-Atlantic.  As a result, the Court will use Ms. Neel's 2009 annual salary at Mid-Atlantic when calculating Ms. Neel's back pay award.

### 2.  Ms. Neel properly mitigated her damages.

Mid-Atlantic's suggested sixty-day limitation on back pay is unsupported by the evidence presented at trial. After her wrongful termination, Ms. Neel certainly had a duty to mitigate her damages.  *Miller v. AT&T*, 83 F. Supp. 2d 700, 706 (S.D.W. Va. 2000) ("[A]n improperly dismissed employee may not remain idle and recover lost wages from the date of discharge")

(internal citations omitted).   However, Ms. Neel testified convincingly that she diligently sought work during the length of her unemployment period.   Ms. Neel searched for long-term care jobs on job-posting websites; contacted colleagues in the industry; sent letters to long term care companies that did not have published job openings; and applied for a variety of positions.   Mid-Atlantic relies on the testimony of Keith Minton and Carole Campbell to suggest that Ms. Neel failed to properly mitigate her damages.   While Mr. Minton's and Ms. Campbell's testimony present generalized views of the market for licensed nursing home administrators in Maryland, their testimony is less relevant than Ms. Neel's testimony regarding her own job search.   Ms. Neel's failure to find a suitable position was not due to inaction on her part.

Nor did Ms. Neel fail to mitigate her damages by refusing to accept the position of corporate wellness director at a company located near Rockville.   Ms. Neel's duty to mitigate her damages requires that she seek and accept employment that is "substantially equivalent" to her position at Mid-Atlantic.   However, the employee "is not necessarily obligated to accept employment which is located an unreasonable distance from [her] home."   *NLRB v. Madison Courier Co.*, 472 F.2d 1307, 1319 (D.C. Cir. 1972) (citing *Florence Printing Co. v. NLRB*, 376 F.2d 216, 221 (4th Cir. 1967), *cert. denied,* 389 U.S. 840 (1967)).   The corporate wellness director position paid $75,000-$80,000 per year, at least one-third less than Ms. Neel's salary at Mid-Atlantic.   The corporate wellness director position was also located a significant distance from Ms. Neel's home.   Because of its location and significantly lower salary, the Court finds that the corporate wellness director position was not substantially equivalent to Ms. Neel's prior employment.   Ms. Neel was under no obligation to accept that position when it was offered to her.

Because Ms. Neel properly mitigated her damages by diligently seeking substantially equivalent employment, the Court finds that Mid-Atlantic owes Ms. Neel lost wages running from the date of her termination through the present date.

> **3.  Mid-Atlantic has not established that Ms. Neel's back pay award should be reduced by her gross income from Insphere Insurance Solutions.**

In 2010, Ms. Neel earned $7,182.23 in gross income as an independent insurance broker with Insphere Insurance Solutions.  On her 2010 tax return, Ms. Neel reported related expenses in the amount of $11,406.00, resulting in a net loss of $4,223.77.  Mid-Atlantic contends that Ms. Neel's back pay award should be reduced by the gross income she received as an insurance broker.  Ms. Neel, on the other hand, contends that her lost wages award should be increased by the amount of her net loss.

As the Third Circuit has noted, a number of factual questions arise when considering how self-employment mitigates a plaintiff's damages:

> For example: has the plaintiff drawn a salary which has reduced, if not eliminated the year-end profit? Have personal expenses, normally paid by a wage earner from a salary, been absorbed by the business, e.g., personal car expenses, insurance, vacations and other personal expenses? Have dividends been paid? Have profits been earned? Have particular expenses been appropriately offset against revenues? . . . While these questions do not exhaust the inquiry, they are but a few of the panoply of questions which must be answered when a plaintiff establishes his own business and asserts his self-employment as proper mitigation. *Each of these questions necessarily must be resolved by the fact finder, against a backdrop of the governing principles recited earlier: that the plaintiff should not receive double benefits, and that the burden is upon the defendant to prove by how much, if at all, the back pay award should be reduced. The aggregate economic gain found by the jury would then constitute the offset against the plaintiff's back pay damage award.*

*Carden v. Westinghouse Elec. Corp.*, 850 F.2d 996, 1005-06 (3d Cir. 1988) (emphasis added).  A number of courts have agreed with the Third Circuit that an employee's back pay award should be offset by the employee's aggregate economic gain.  *Smith v. Great Am. Rests., Inc.*, 969 F.2d 430, 439 (7th Cir. 1992) (fact-finders should deduct actual earnings from the lost compensation

award); *Ford v. Rigidply Rafters, Inc.*, 984 F. Supp. 386, 389 (D. Md. 1997) ("To make the plaintiff whole, the award of back pay should be the difference between what the employee would have earned had the wrongful conduct not occurred from the period of termination to judgment, and the actual earnings during that period.") (Title VII case); *Bonidy v. Vail Valley Ctr. for Aesthetic Dentistry, P.C.*, 232 P.3d 277, 283-84 (Colo. Ct. App. 2010) ("When a wrongfully terminated employee becomes self-employed, the aggregate economic gain found by the trier of fact constitutes the offset against the employee's back pay damages award.").

Mid-Atlantic has not proffered any case law to refute the position that a prevailing employee's lost compensation award should be offset by the employee's aggregate economic gain when the employee has mitigated her damages through self-employment.  Rather, Mid-Atlantic suggests that Ms. Neel has not properly established that she lost money on her insurance brokerage business.  Mid-Atlantic's argument fails to recognize that it bears the burden of proving by how much Ms. Neel's damage award should be reduced.  *Carden*, 850 F.2d at 1004-05 (citing *Ford Motor Co. v. EEOC*, 458 U.S. 219, 232 (1982)); *Cline*, 689 F.2d at 488-89 (ADEA case); *see also Martin*, 48 F.3d at 1358-59.

Mid-Atlantic has not met its burden to show that Ms. Neel's damage award should be reduced by the amount of her insurance business income.  Though Mid-Atlantic contends that the loss shown on Ms. Neel's tax return is not an accurate measure of the benefit Ms. Neel derived from her insurance business, Mid-Atlantic has not proved that the net loss Ms. Neel reported for tax purposes is exaggerated or unfair.  Because Mid-Atlantic has not met its burden, the Court accepts that Ms. Neel suffered a net loss of $4,223.77 in relation to her self-employment as an insurance broker. However, Ms. Neel has not provided any case law to support her suggestion that Mid-Atlantic should reimburse her for this net loss.  As a result, this

Court will neither reduce Ms. Neel's back pay award by her gross earnings as an insurance broker nor increase her award by the value of her net loss. Indeed, the Court will not consider Ms. Neel's insurance brokerage business when calculating her damages award.

### 4. Ms. Neel's back pay award is $116,030.02.

Ms. Neel's final gross salary at Mid-Atlantic was $123,614.00 per year. This salary was paid out in bi-weekly installments of $4,754.40. The parties agree that Ms. Neel lost one bi-weekly paycheck as a result of her termination in December, 2009. From the date of her termination through the date of this verdict, Ms. Neel would have earned $323,298.40 at Mid-Atlantic. During the same time period, Ms. Neel earned $207,268.38. Specifically, in 2010, Ms. Neel earned $27,645.11 from Collington. In 2011, Ms. Neel earned $122,075.17 from Collington. Since January 1, 2012, Ms. Neel has earned $3,836.54 per biweekly pay period from Collington. This Court has calculated that, as of the date of this opinion, Ms. Neel has earned $57,548.10 from Collington in 2012.

This Court finds that Mid-Atlantic owes Ms. Neel $116,030.02 for her lost wages from the time of her termination through the date of this verdict. This amount represents the earnings Ms. Neel would have made at Mid-Atlantic, less her actual earnings during the same time period.

### B. Mid-Atlantic Owes Ms. Neel $2,975.85 in Lost Health Benefits.

Ms. Neel also seeks to recover the costs of both her health insurance coverage and her husband's health insurance coverage during her period of unemployment. Ms. Neel received personal health insurance coverage through Mid-Atlantic, and incurred health insurance and health care costs from the date she was terminated at Mid-Atlantic until the date that her health insurance coverage began at Collington.

Ms. Neel was married on September 25, 2009. She planned to add her husband to her health insurance coverage when she returned from her FMLA leave. However, Mid-Atlantic's

health insurance plan requires that employees add spouses to their plan within thirty (30) days of their marriage.  As a result, Ms. Neel would not have been able to add her husband to her health insurance coverage even if she had returned to Mid-Atlantic in December, 2009.

Because Mr. Neel could not have been added to Ms. Neel's health insurance in December, 2009, damages comprising the cost of Mr. Neel's health insurance premiums are unwarranted.  It is entirely appropriate, however, to compensate Ms. Neel for her health-related expenditures during her unemployment.  Ms. Neel actively sought health insurance coverage during her period of unemployment, but obtained health insurance coverage for only a portion of that time.  During the relevant time period, Ms. Neel spent $981.03 on COBRA health insurance coverage, $1,280.00 on health insurance coverage through the Maryland Health Insurance Program, and $1,914.82 on necessary medical expenses when she had no health coverage. Though Ms. Neel paid nothing for her health insurance coverage while employed at Mid-Atlantic, the company required employees to contribute $50 per pay period to their health insurance premium beginning on December 1, 2009.  From the evidence presented at trial, the Court has determined that Ms. Neel missed twenty-four (24) bi-weekly pay periods at Mid-Atlantic from the date of her termination through November 30, 2010.  Using these figures, the Court finds that Ms. Neel would have contributed $1,200.00 towards the cost of her health insurance premiums during the relevant time.

Ms. Neel testified that her current health care benefits at Collington are comparable to the health care coverage she received through Mid-Atlantic.[1]  The award for lost health benefits is,

---

[1] Ms. Neel pays higher health insurance premiums with her Collington-provided health insurance ($128.59 per pay period) than she would have paid had she remained at Mid-Atlantic ($50 per pay period).  However, Ms. Neel's current health insurance plan covers both herself and her husband, while her Mid-Atlantic health insurance covered only Ms. Neel. For this reason, this Court will not compensate Ms. Neel for the difference in cost of her current health insurance and her Mid-Atlantic health insurance.

therefore, cut off on December 1, 2010, the date that Ms. Neel began receiving health insurance coverage through Collington.

For these reasons, this Court finds that Mid-Atlantic owes Ms. Neel $2,975.85 in lost health benefits for the time period of December 2, 2009 to November 30, 2010.  This amount represents $4,175.85 in Ms. Neel's health insurance and health care expenses for the period, less $1,200.00, the amount that Ms. Neel would have contributed to her health insurance premiums, had she remained an employee at Mid-Atlantic.

### C.  Mid-Atlantic Owes Ms. Neel $7,664.51 in Pre-Judgment Interest.

Ms. Neel requests that she be awarded prejudgment interest on her lost wages and benefits at the rate of six percent, Maryland's legal interest rate.  Mid-Atlantic argues that "the plaintiff is not entitled to pre-judgment interest, which rewards her for her lack of diligence in locating replacement employment."  Def.'s Closing Arg. 2.

Contrary to Mid-Atlantic's assertion, courts must award pre-judgment interest to prevailing FMLA plaintiffs.  *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 301-02 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 114 (2009), 130 S. Ct. 201 (2009).  "Under the FMLA, an employer 'shall be liable' for the pre-judgment interest on the amount of 'any wages, salary, employment benefits, or other compensation denied or lost to [an employee] by reason of the [FMLA] violation.'"  *Dotson*, 558 F.3d at 301; 29 U.S.C. § 2617(a)(1)(A)(i)-(ii).  "Pre-judgment interest automatically becomes part of the damages award under the plain terms of the statute."  *Dotson*, 558 F.3d at 302.

The FMLA does not dictate what interest rate courts should employ, but requires that pre-judgment interest be calculated at "the prevailing rate."  29 U.S.C. § 2617(a)(1)(A)(i)-(ii); *Dillon v. Md.-Nat'l Capital Park Planning Comm'n*, Civ. No. WGC-04-994, 2007 WL 4557850 at *3

(D. Md. Mar. 9, 2007) (awarding pre-judgment interest in the amount of the general rate established in 28 U.S.C. § 1961). "The rate of pre-judgment interest for cases involving federal questions is a matter left to the discretion of the district court." *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1031 (4th Cir. 1993). This Court is not bound by Maryland's six percent legal rate of prejudgment interest because this case does not rest on the determination of Maryland law. *Fed. Sav. & Loan Ins. Corp. v. Quality Inns, Inc.*, 876 F.2d 353, 359 (4th Cir. 1989).

Courts often award pre-judgment interest at the prime interest rate. *See, e.g.*, *Cement Div., Nat'l Gypsum Co., v. City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir. 1998) (in determining prejudgment interest, "the best starting point is to award interest at the market rate, which means an average of the prime interest rate for the years in question"). In this case, the Court finds that the appropriate rate of prejudgment interest to properly compensate Ms. Neel is the prime interest rate, compounding annually. The Court takes judicial notice of the fact that the prime interest rate was 3.25% on December 2, 2009, the date of Ms. Neel's termination, and has not changed since that time.

Using the prime interest rate of 3.25% per annum, the Court finds that Ms. Neel is entitled to pre-judgment interest in the amount of $7,664.51.

### D.  Mid-Atlantic Owes Ms. Neel $126,670.38 in Liquidated Damages.

Ms. Neel seeks liquidated damages in the amount equal to the sum of her lost compensation and prejudgment interest.  Mid-Atlantic asserts that liquidated damages are inappropriate because Mid-Atlantic acted in good faith and had objectively reasonable grounds for believing that its actions regarding Ms. Neel's termination complied with FMLA. Specifically, Mid-Atlantic argues that its actions were in good faith and objectively reasonable

because the company sought the legal advice of an experienced employment attorney and followed that attorney's advice.

Employees who have been unlawfully terminated under the FMLA are entitled to an additional award of liquidated damages equal to the sum of the amount awarded for damages and the interest on that amount. *Dotson*, 558 F.3d at 302; 29 U.S.C. § 2617(a)(1)(A)(iii). Under normal circumstances, liquidated damages are awarded automatically under the statute. *Dotson*, 558 F.3d at 302. The court may, however, choose not to award liquidated damages if the employer "proves to the satisfaction of the court" that the FMLA violation was done "in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation." *Id.*, 29 U.S.C. § 2617(a)(1)(A)(iii). "The employer has a 'plain and substantial burden' to persuade the court that its failure was in good faith and that it would be unfair to impose liquidated damages." *Dotson*, 558 F.3d at 302 (citing *Mayhew v. Wells*, 125 F.3d 216, 220 (4th Cir. 1997) (interpreting liquidated damages provision of the Fair Labor Standards Act)).

An employer who wishes to deny reinstatement to a key employee who has taken FMLA leave

> must give written notice to the employee at the time the employee gives notice of the need for FMLA leave (or when FMLA leave commences, if earlier) that he or she qualifies as a key employee. At the same time, the employer must also fully inform the employee of the potential consequences with respect to reinstatement and maintenance of health benefits if the employer should determine that substantial and grievous economic injury to the employer's operations will result if the employee is reinstated from FMLA leave.

29 C.F.R. § 825.219(a) (2012). In addition,

> [a]s soon as an employer makes a good faith determination . . . that substantial and grievous economic injury to its operations will result if a key employee who has given notice of the need for FMLA leave or is using FMLA leave is reinstated, *the employer shall notify the employee in writing of its determination*, that it cannot deny FMLA leave, and that it intends to deny restoration to employment on completion of the FMLA leave. . . . *This notice must explain the basis for the employer's finding that substantial and grievous economic injury will*

*result, and, if leave has commenced, must provide the employee a reasonable time in which to return to work,* taking into account the circumstances, such as the length of the leave and the urgency of the need for the employee to return.

29 C.F.R. § 825.219(b) (emphasis added).

In his memorandum granting summary judgment in favor of Ms. Neel, Judge Bredar found that Mid-Atlantic had neither provided Ms. Neel with proper notice of its intent to deny her restoration nor given her a reasonable time in which to return to work. Mem. 18. "Mid-Atlantic had no legitimate basis for denying restoration of Neel's job to her." *Id.* Judge Bredar further explained that

> [t]he notification that Mid-Atlantic actually gave to Neel before she took her leave did not explicitly convey an intent to deny restoration at the end of her FMLA leave. Relying upon inadequate statutory compliance is not an excuse for terminating an employee improperly, as Mid-Atlantic did here. Since Mid-Atlantic cannot legitimately rely upon proper FMLA notification as a basis for termination, it is left with the unvarnished agreement by [Mid-Atlantic's chief operating officer Jeff] Grillo with the statement that Neel would not have been terminated if she had not taken FMLA leave. That constitutes direct evidence of a violation of the FMLA . . . .

*Id.* at 19.

At trial, Traci Alley testified that she is the corporate human resources director for Mid-Atlantic Health Care, LLC.  Alley Test., 147:7-11.  Ms. Alley testified that she has attended seminars on FMLA, has read both the text of the Act and its accompanying regulations, and reviews the FMLA fairly regularly on the Department of Labor and Equal Employment Opportunity Commission websites. Alley Test., 151:8-152:4.   Attorney Laura Rubenstein testified that she advised Mid-Atlantic and its corporate parent, Mid-Atlantic Health Care, LLC, on employment issues.  Rubenstein Test., 8:2-5.  Between October 5, 2009 and December 11, 2009, Ms. Rubenstein counseled Ms. Alley and Mr. Grillo regarding Ms. Neel's FMLA request. Rubenstein Test., 8:6-11, 17:17-24, 23:1-24:21. Ms. Rubenstein's advised that Ms. Neel could be properly classified as a "key employee" under FMLA and that the company would not

necessarily be required to restore Ms. Neel to her position after she completed her FMLA leave. Rubenstein Test., 14:2-7.

Critical issues were absent from Ms. Rubenstein's conversations with Mr. Grillo and Ms. Alley.  Ms. Rubenstein, Mr. Grillo, and Ms. Alley did not discuss FMLA's requirement that a company give its employee a reasonable time in which to return to work after learning that he or she will otherwise be denied restoration.  *See* Rubenstein Test. 53:12-60:11.  They never discussed whether telling Ms. Neel that her replacement had been identified sufficiently explained Mid-Atlantic's failure to restore Ms. Neel to her position.  Rubenstein Test. 52:3-13. Mid-Atlantic's failure to seek advice on these aspects of FMLA does not meet the company's burden of demonstrating good faith and objectively reasonable behavior.  Mid-Atlantic's failings are particularly glaring in light of the testimony that both Ms. Alley and Ms. Rubenstein are well-versed in the Act and its accompanying regulations.

As Judge Bredar aptly stated, Mid-Atlantic had no legitimate basis for failing to restore Ms. Neel to her position.  For these reasons, the Court awards liquidated damages to Ms. Neel as mandated by the Act.  Liquidated damages are awarded in the amount equal to Ms. Neel's lost compensation (both lost wages and lost benefits) plus the amount of pre-judgment interest, or $126,670.38.

### E.  Mid-Atlantic Has Not Offered to Reinstate Ms. Neel to Her Previous Position or to an Equivalent Position.

Ms. Neel argues that Mid-Atlantic has never offered to reinstate her to her previous position or an equivalent position.  Ms. Neel also asserts that reinstatement is not feasible because Ms. Neel would face animosity and hostility from Mid-Atlantic employees if she resumed work there.  Mid-Atlantic counters that it has provided Ms. Neel with a legitimate reinstatement offer.

In addition to lost compensation, prejudgment interest, and liquidated damages, the FMLA entitles a wronged employee to "such equitable relief as may be appropriate, including employment, reinstatement, and promotion." 29 U.S.C. § 2617(a)(1)(B); *Dotson*, 558 F.3d at 300. An employee who takes qualifying FMLA leave is entitled to restoration to either her pre-leave position or to "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1); *Csicsmann v. Sallada*, 211 Fed. App'x 163, 166 (4th Cir. 2006). An "equivalent position" is "one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status." 29 C.F.R. § 825.215 (2012). "Equivalent pay" includes bonuses. *Id*. Furthermore, "[t]he employee must be reinstated to the same or a geographically proximate worksite (i.e., one that does not involve a significant increase in commuting time or distance) from where the employee had previously been employed." *Id*. The employer bears the burden of proving that an offer of reinstatement is sufficiently comparable to the employee's previous job. *Xiao-Yue Gu v. Hughes STX Corp.*, 127 F. Supp. 2d 751, 756 (D. Md. 2001) (ADEA case).

Mid-Atlantic has not demonstrated that the employment offer it gave Ms. Neel shortly before this trial constitutes a sufficient offer of reinstatement. Setting aside the issue of whether an offer from Mid-Atlantic Health Care, LLC qualifies as an offer from Ms. Neel's previous employer, the plain terms of the offer show that it is not equivalent to Ms. Neel's previous employment with Mid-Atlantic. The offer letter, which was submitted to Ms. Neel more than two years after her wrongful termination, does not provide any information regarding bonus eligibility. At her previous position with Mid-Atlantic, Ms. Neel was eligible for a bonus of up to 25% of her previous year's earnings. The offer letter includes no information regarding the

location of the Chapel Hill facility; Mid-Atlantic has provided no details regarding that facility's location.  This Court cannot gauge whether the Chapel Hill nursing home is located in an area that is geographically proximate to the Fairfield facility where Ms. Neel formerly worked.

Mid-Atlantic's employment offer does not provide for the same pay that Ms. Neel previously enjoyed while she was employed at Mid-Atlantic.  Nor does the offer indicate whether the position offered is located at a geographically proximate location.  For these reasons, the Court finds that Ms. Neel has not been offered reinstatement to her pre-leave position or to an equivalent position.

### F.  An Award of Front Pay is Inappropriate.

Because Ms. Neel has not been offered reinstatement to an equivalent position, she seeks front pay for a period of time to be determined by this Court.  Mid-Atlantic counters that Ms. Neel is not entitled to front pay because she rejected Mid-Atlantic's legitimate reinstatement offer.

While FMLA does not identify front pay as an equitable remedy available under the Act, the Fourth Circuit has recognized it as "a proper form of relief that is 'an alternative and complement to reinstatement.'"  *Dotson*, 558 F.3d at 300 (citing *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 307 (4th Cir. 1998).  Determinations regarding the award of front pay are made by the trial judge, who must "temper" the award of front pay by recognizing the "potential for windfall" to the plaintiff.  *Dotson*, 558 F.3d at 300 (citing *Duke v. Uniroyal*, 928 F.2d 1413, 1414 (4th Cir. 1991) (Title VII case)); *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 504 (4th Cir. 2001).  Front pay is generally available when an employer has unlawfully terminated an employee and reinstatement of the employee is impossible.  *Loveless v. John's Ford, Inc.*, 232 Fed. App'x 229, 238 (4th Cir. May 9, 2007) (ADEA case) (relying on *Duke*, 928 F.2d at 1423).

Because Mid-Atlantic has not provided a sufficient offer of reinstatement, the Court must consider whether front pay is an appropriate alternative. The evidence shows that it is unlikely that Ms. Neel would have remained at Mid-Atlantic for the long term. Both Mr. Grillo and Ms. Alley testified that licensed nursing home administrators remain at Mid-Atlantic for an average of 2.8 years. Ms. Neel's own work history further bolsters Mid-Atlantic's argument. Ms. Neel voluntarily changed licensed nursing home administrator positions twice before she began work at Mid-Atlantic, working for each nursing home management company for between two and four years.

More than four years have elapsed since Ms. Neel began her employment at Mid-Atlantic. The evidence suggests that, even if Mid-Atlantic had not wrongfully terminated her, Ms. Neel would have likely moved on to different employment sometime before the date of this verdict. Furthermore, Ms. Neel has found a comparable job in the same field, and her current total compensation is very close to her base salary at Mid-Atlantic. An award of front pay is inappropriate under these circumstances because such an award would constitute a windfall. *See Dotson*, 558 F.3d at 300 (the district court did not abuse its discretion by denying front pay to an employee who had secured comparable employment within his chosen industry). For this reason, the Court finds that an award of front pay is unwarranted.

### G. Attorney's Fees

In FMLA cases in which the plaintiff prevails, "The court . . . shall, in addition to any judgment awarded to the plaintiff, allow a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action to be paid by the defendant." 29 U.S.C. § 2617(a)(3); *Dotson*, 558 F.3d at 303; *see McDonnell v. Miller Oil Co.*, 134 F.3d 638, 640 (4th Cir.1998). "The

amount of attorneys' fees awarded is at the trial court's discretion." *Dotson*, 558 F.3d at 303 (citing *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1359 (4th Cir.1995)).

Ms. Neel's counsel is ordered to submit, within thirty (30) days of the date of this order, a statement of reasonable attorneys' fees and costs for consideration by the Court, which should comply with Appendix B of the Local Rules of this Court.  Mid-Atlantic will be permitted fourteen (14) days from the filing of Ms. Neel's statement to file any particularized objections to the statement of attorneys' fees and costs.

### III.    Conclusion

For the foregoing reasons, the Court finds Mid-Atlantic liable for $116,030.02 in lost wages; $2,975.85 in lost health benefits; $7,664.51 in pre-judgment interest; $126,670.38 in liquidated damages; and reasonable attorneys' fees.  The total amount that Mid-Atlantic owes Ms. Neel is $253,340.76, plus reasonable attorneys' fees to be determined by this Court.  A separate Order follows.

Dated:  <u>August 9, 2012</u>                                       <u>        /s/                        </u>
                                                                        Stephanie A. Gallagher
                                                                        United States Magistrate Judge